## WOODS *v.* STATE.

### Opinion delivered March 20, 1916.

1. HOMICIDE—FIRST DEGREE MURDER—SUFFICIENCY OF EVIDENCE.—Evidence held sufficient to warrant a verdict of first degree murder.
2. CRIMINAL LAW—IDEM SONANS.—The doctrine of *idem sonans* does not apply, where an indictment charged Henry Wood with the crime of killing Vina Wood, and the proof showed that their names were Henry Woods and Vina Woods.
3. CRIMINAL LAW—NAMES IN INDICTMENT—VARIANCE.—Defendant was indicted as Henry Wood for the killing of Vina Wood; defendant testified that his name was Woods and that deceased was Woods also; certain witnesses who had known the parties testified that the defendant and deceased were known in the community as both Wood and Woods. *Held*, a conviction would be upheld, when the court instructed the jury that they might convict, if they found beyond a reasonable doubt, that Henry Wood and Vina Wood, named in the indictment, were the same persons as the defendant and deceased, mentioned in the proof.

Appeal from Craighead Circuit Court, Lake City District; *W. J. Driver*, Judge; affirmed.

The appellant, *pro se.*

1. There is a fatal variance between the indictment and proof. Wood and Woods are not *idem sonans.* 5 Ark. 72; 21 Am. & Eng. Enc. Law, 313; 21 Tex. App. 320; Defendant was entitled to have the indictment drawn

definite enough to notify him of the crime.   7 Ark. 70;
*Ib.* 394; 24 *Id.* 574; 68 *Id.* 244.

*Wallace Davis,* Attorney General and *Hamilton
Moses,* Assistant, for appellee.

1.   The variance was not fatal.   The names are
*idem sonans.*   The proper party was convicted.   The
jury found there was no variance.   1 Ark 503; 21 *Id.* 462;
7 *Id.* 70; 50 *Id.* 97; 60 *Id.* 517; 100 *Id.* 149; Kirby's Digest,
§ 2332; 35 Ark. 385; 105 *Id.* 84; 101 *Id.* 59.

HART, J.   The defendant was indicted for the crime
of murder in the first degree.   He was tried before a
jury which found him guilty and assessed his punishment
at death by electrocution.   From the judgment rendered,
the defendant has duly prosecuted an appeal to this
court.

The facts proved by the State are substantially as
follows:

On July 19, 1915, the defendant killed deceased at
a boarding house run by Rosa Tucker and her husband,
Ferrell Tucker in the Lake City District of Craighead
County, Arkansas.   The defendant Henry Woods and
the deceased Vina Woods had formerly been husband and
wife.   They had lived a part of the time in the State of
Oklahoma and a part of their married life was spent in
the State of Arkansas.   While they were living in Craig-
head County, Arkansas, the defendant got into trouble
about selling whiskey and went to the State of Oklahoma
and remained away about eighteen months.   During the
time he was gone he corresponded with his wife but she
obtained a divorce from him.   At the time she was killed
she lived with the Tuckers and slept in the same room
with them.   She had been keeping company with Monroe
Heister and was reputed to be engaged to him.   He
also boarded with the Tuckers.

The defendant came back from Oklahoma for the
purpose of trying to persuade his wife to marry him
again. On the night of the eighteenth of July, 1915, he came
to the home of Walter Gunn who lived about a quarter

of a mile from the Tuckers and asked him the way to their boarding house.

When the defendant arrived at the Gunn's house that night, he tapped on the door step with his pistol to wake Gunn up and then shot off his pistol four or five times. Gunn showed the defendant the way to the Tuckers and defendant arrived there soon after midnight. He went into the house occupied by the Tuckers and found his wife in their room. He got into bed with her and after they had talked a while, deceased got up and went into another room and motioned for Rosa Tucker to follow her. She told Rosa that her husband had a pistol which she had put in her trunk and asked Rosa to lock the trunk. Rose told her husband to lock the trunk and while he was trying to find the key, he found the pistol and put it in his bosom and gave his wife the key. Vina then got back on the bed with the defendant and they continued to talk the rest of the night. Rose Tucker said: "We had breakfast before daylight. After breakfast, the defendant asked me for the key to Vina's trunk. I gave the key to my husband. Vina said, "Well just as well give him the key. Just as well now as any time, it is going to be some time—that he is going to kill her."

The defendant was given the pistol and went out of the house and in a short time came back and asked Vina to go walking with him. She refused saying she didn't want to go out there because he was going to kill her. The defendant told her that he was not going to kill her and insisted on her going walking with him. They went down the road a little piece and talked a while. The deceased then came back to the house and the defendant went over to Walter Gunn's. In a short time the defendant came in at the front door and asked where his lantern was. It was then daylight. Vina stepped inside the middle door and showed him where his lantern was. He picked up the lantern and jerked back his coat to pull his pistol, I ran. Vina cried out for him not to shoot and commenced screaming.

The husband of Rosa Tucker corroborated her testimony and stated that he was at the mill at the time the shooting occurred and went to the house at once and that Vina was drawing her last breath when he got there. He stated that the pistol used by the defendant was a thirty-two Colt's revolver; that he shot deceased near the center of the breast and in the head just below the right ear.

Walter Gunn told the jury about the defendant coming to his house and inquiring the way to the Tucker boarding house as stated above. He then said, that the defendant came back to his house the next morning between six and six-thirty o'clock; that the defendant came up to him and said he wanted to shake hands with him for the last time; that he said to the defendant, "What is the matter Henry? and the defendant said, "I am going to kill that damn bitch this morning." Gunn then asked him who he was talking about and he said, "That woman down there." The defendant also said he was going to kill Chas. Craig and Monroe Heister. Gunn finally got the defendant to promise that he would not kill deceased and that he would go back to the boarding house and get his lantern and then come back and stay with him. He said that defendant went down towards the boarding house and after he had gone a little ways turned around and asked him if he had any thirty-two cartridges and that he replied that he did not and that defendant then said, well what I have got will do, and went in a trot from there to the boarding house; that some four or five minutes after that he heard the pistol fire.

Another witness who was standing near and heard most of the conversation between Gunn and the defendant corroborated the testimony of Walter Gunn.

Another witness for the State testified that he saw the defendant walk into the house, draw his gun and commence shooting at deceased; that she threw up her hands and asked him not to do it; that he shot twice; that Vina fell over on the bed and defendant went over towards her

and shot again, and that she screamed until the last shot was fired. Vina died soon after she was shot by the defendant. The defendant ran off and escaped into Canada. Later he was arrested there and brought back for trial.

The defendant testified in his own behalf as follows: "My name is Henry Woods not Henry Wood. My wife's name is Vina Woods. My wife promised to remarry me and we agreed to meet at Poplar Bluff for that purpose. I went there but she did not come. I then went to Oklahoma and wrote her a letter stating that I was willing to carry out my promise to her. I received a letter from her in which she stated she was still willing to marry me. When I came back to Arkansas, I went up to the boarding house where my wife was staying and hollered. I then went into the room where she was and walked up to the bed and kissed her. She seemed cold to me and when I asked her what was the matter, she replied that she was not going to live with me any more. I tried to persuade her to stick to her promise. I had taken my pistol off when I first got there and put it under the pillow. I threatened to blow out my brains. She asked me for the gun and I gave it to her and she put it in the trunk. The next morning I asked my wife to go walking with me and she did say she was afraid I would kill her. I told her that I would not hurt her. We walked off about thirty yards from the house and had a talk. She agreed to give up our little daughter. I did not want a stepfather over her. I went over to Walter Gunn's on the morning of the killing but he is mistaken in what he said. I did not say anything about killing my wife and did not holler back and ask him if he had any thirty-two cartridges. I had no ill will towards my wife and did not realize what I was doing when I shot her. After the killing I went through the bottom and escaped to Canada.

(1) The evidence on the part of the State was sufficient to warrant a verdict of murder in the first degree. According to it there was a specific intent to kill deceased

formed in the mind of the defendant at or before the time he was at the home of Charley Gunn on the morning of the killing. He told Chas. Gunn in the hearing of another witness, that he intended to kill her, at the same time referring to her by a vile name. He walked on back towards the boarding house and killed deceased as soon as he entered it. There was no provocation whatever for the killing and according to the testimony of the State, it was the result of deliberation and premeditation. The defendant himself admits the killing and the only excuse he gave for it was that he did not realize what he was doing.

His insanity at the time of the killing was submitted to the jury under proper instructions. The court also gave the usual instructions on the question of homicide, of reasonable doubt and the credibility of the witnesses. The guilt or innocence of the defendant was submitted to the jury upon competent evidence and under instructions which fully covered every phase of the case. The verdict of the jury was fully warranted by the evidence.

(2) The defendant was indicted as Henry Wood and he was charged in the indictment with killing Vina Wood. He testified that his name was Henry Woods and that deceased's name was Vina Woods. Therefore his counsel insisted that there was variance between the indictment and the proof.

Charley Craig was a witness for the State and testified that he was the uncle of the deceased and had known her and the defendant all their lives. We quote from his testimony as follows:

"Q. Did you know Henry Woods?

A. Yes, sir.

Q. Do you know what is the name of the defendant, whether it is Henry Wood or Henry Woods?

A. No, sir; I don't know which it is. I have heard it both ways. Used both ways. I never knew for sure whether it was Wood or Woods.

Q. Did you know Vina Woods?

A. Yes.

Q.  What was her correct name, Vina Wood or Vina Woods?

A.  They have called it both ways.

Q.  Was she the wife of Henry Woods?

A.  Yes, sir.

Q.  Do you know of your own personal knowledge whether the Vina Wood mentioned in this indictment was one and the same person that was killed over there?

A.  Yes, sir.

Q.  Whatever her name might have been, whether it was Vina Wood or Vina Woods, she was one and the same person?

A.  Yes, sir.

Q.  And whatever Henry Woods name may be, whether Henry Wood or Henry Woods, he is the one and the same person that is charged with the offense?

A.  Yes, sir."

Counsel for the State insists there is no variance because the names come within the doctrine of *idem sonans* but this court has decided adversely to that contention. In the case of *Semon* v. *Hill,* 7 Ark. 70, it was there said that the letter "S" terminating the letters of a name in our language is seldom silent, and that if it appears as the last letter of a name, the pronunciation thereof conveys to the ear an entirely different sound than that conveyed when the consonant is omitted. In the case note to 52 L. R. A. (N. S. ) page 939, the author states that the great majority of the decisions seem to establish the general rule that the addition or omission of the final "S" to a name creates such a change in the sound of the name that the variant name can not be said to be *idem sonans*. The decisions from quite a number of States to that effect are cited. The reason given is that the final "S" to a name is not silent.

(3)  We are of the opinion, however, that the testimony of the State was sufficient to warrant the court in submitting to the jury the question of whether the defendant and deceased were as well known and called by the name of Henry Wood and Vina Wood respectively

as Henry Woods and Vina Woods. This results from the doctrine of interchangeability of names.

Charles Craig was the uncle of the deceased and had known both her and the defendant all their lives; and under his testimony the question of variance was one of fact for the jury. *Bennett* v. *State,* 84 Ark. 97. In that case the court said: "The question of identity of the person described in the indictment with the one mentioned in the evidence is one of fact, to be established, like any other fact, to the satisfaction of the jury." See also *Commonwealth* v. *Gormley,* 133 Mass. 580.

Under the testimony of Charles Craig, as above stated the jury might have found that defendant and deceased were as well known and called by the name of Henry Wood and Vina Wood respectively as by the name of Henry Woods and Vina Woods. This question of fact was submitted to the jury under the following instruction: "You are instructed that if you find from the evidence, beyond a reasonable doubt, that Henry Wood and Vina Wood, named in the indictment, are one and the same person, respectively, as the defendant and the deceased, mentioned in the evidence in this case, then there would be no variance between the allegations of the indictment, and the evidence, and it would be your duty to convict the defendant, provided you find him guilty under the instructions hereinbefore given you."

Another reason for not reversing the judgment on account of the alleged error in spelling the defendant's name is given in *Bridger* v. *State,* 122 Ark. 391. This case was so recently decided that it is not necessary again to state the reasons there given.

We have carefully examined the record and find no prejudicial errors in it. Therefore, the judgment must be affirmed.